[No. F019296. Fifth Dist. Nov. 30, 1995.]

BLAINE WILLARD, Plaintiff and Appellant, v.
CATERPILLAR, INC., Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

*Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of parts 2, 3 and 4 of Discussion.

## COUNSEL

Klein, Wegis, DeNatale, Hall, Goldner & Muir, Ralph B. Wegis, Denise Martin, David L. Saine, Marisa S. Vidaurreta and Jeffrey W. Noe for Plaintiff and Appellant.

Haight, Brown & Bonesteel, Roy G. Weatherup, Armando M. Galvan, Elliott D. Olson, Luce, Forward, Hamilton & Scripps and Charles A. Bird for Defendant and Appellant.

Pillsbury, Madison & Sutro, Sidney K. Kanazawa and Kevin M. Fong as Amici Curiae on behalf of Defendant and Appellant.

## Opinion

**THAXTER, Acting P. J.**—This products liability case requires our consideration of the evolving tort of intentional spoliation of evidence. Balancing relevant factors, we will hold that the trial court erred in submitting to the jury a cause of action for intentional spoliation of a manufacturer's design documents, when the destruction occurred before the plaintiff's injury and after the product had been on the market and in use for nearly 25 years with a negligible history of accidents similar to the plaintiff's.

### Procedural History

Blaine Willard (Willard or plaintiff) sustained serious injuries while attempting to repair a 1955 Caterpillar model D7-C crawler tractor on October 29, 1990. He sued Caterpillar and the owner of the tractor, Belluomini Farms, for his injuries, alleging causes of action for products liability and negligence. During trial, over Caterpillar's objection, the trial court permitted Willard to amend his complaint to conform to proof and add claims for spoliation of evidence and punitive damages.

As pertinent to the issues raised on appeal, the jury returned a special verdict finding there was a defect in the design of the D7 tractor, Caterpillar was negligent, and the design defect and negligence caused injury to Willard. Willard's own negligence contributed to 50 percent of his injuries. Belluomini Farms was not negligent. The jury also found Caterpillar destroyed documentation relevant to the issues of the case which substantially impaired Willard's ability to prove his case, although Caterpillar's conduct did not exhibit malice, oppression, or fraud. As a result, Willard suffered economic damages of $707,098.11 and noneconomic damages of $450,000.

After denying posttrial motions by both parties, the trial court entered judgment for Willard in the amount of $578,549.05 (50 percent of $1,157,098.11). Both parties appeal.

### Facts

*The D7-C Tractor*

Caterpillar manufactured the model D7-C crawler tractor involved in Willard's accident in 1955. The 1955 D7-C is powered by a diesel engine and has a manual transmission with an oil-bathed "wet" clutch.

During and prior to the 1950's, starting the diesel engine was a major challenge. Unlike a gasoline engine which uses spark plugs to ignite fuel, the

diesel engine ignites its fuel through heat resulting from compression of the fuel in the cylinders. Creating heat by compression required substantial cranking. Battery and starter motor technology had not developed to the extent that electric starter motors could sustain cranking long enough to start diesel tractor engines in cold weather. Caterpillar addressed the starting problem by developing and patenting a gasoline-powered starter motor, referred to as the pony engine, which was capable of supplying unlimited cranking.

The pony engine was mounted on the side of the diesel engine. A manually controlled gear system transferred power from the gasoline engine to the flywheel of the diesel engine to turn it over for starting. In 1955, the pony engine was started with the crank. By 1959, many of these engines had electric starters, but the crank remained a part of the unit because electric starting was somewhat unreliable. The pony engine was phased out during the 1960's and direct electric starting became standard in the 1970's.

The basic design of the D7-C starting system was implemented in 1940. Between 1940 and 1961, 50,000 D7 tractors were built. Caterpillar tractors are expensive but durable and reliable. At the time of trial in 1992, the D7 tractor that caused Willard's injuries was still in use at Belluomini Farms. Caterpillar expected to supply component parts for its 1955 D7 tractors for at least another 10 years.

*Proper Startup Procedure*

The D7-C has a multistep startup procedure. The first steps are carried out in the operator's station or cab. They are: (1) disengage the master clutch, place the transmission gear selector lever and the transmission forward and reverse lever in neutral, (2) move the governor (fuel flow control) forward as far as possible to shut off diesel fuel to the diesel engine, and (3) set the brake. The operator then leaves the cab and stands, kneels, or squats on the tractor's left track to start the pony engine. He sets the compression release lever to the start position, disengages the pony engine clutch, turns on the gasoline petcock which controls fuel flow, turns on the ignition switch, adjusts the choke, and starts the engine by pressing the electric starter switch.[1] The operator then engages the pinion gear at the end of the starter motor shaft to the diesel engine flywheel, moves the compression release lever to the run position, and returns to the cab.

When the diesel engine's temperature and oil pressure have reached operating levels, as indicated by controls in the cab, the operator starts the

---

[1]The D7 tractor on which Willard was injured was fitted with an electronic starter at some point after it left the manufacturer.

diesel by opening the fuel governor. When the diesel engine is running properly, the operator returns to the track and turns off the pony engine.

The D7 tractor had a metal warning plaque located near the operator's seat that stated:

### "CAUTION

### "BEFORE STARTING
### "DIESEL ENGINE

### "① DISENGAGE FLYWHEEL CLUTCH
### "② PLACE GEAR SHIFT LEVERS IN NEUTRAL
### "③ LOCK BRAKE PEDAL"

Additionally, a red warning decal near the pony engine stated:

 **WARNING**

**Before operating this machine, read the Operator's Guide and all safety instructions**

**FOLLOW SAFE OPERATING PRACTICES before starting engine and when parking machine;**

**Place Transmission Control in Neutral**

..............................................................................

..............................................................................

**Set Brakes**

According to David Balzer, Caterpillar's expert/representative, the on-track starting procedure used in D7 tractors had not resulted in any injury-producing accidents prior to Willard's.

*Willard's Accident*

At the time of the accident, 56-year-old Willard had been a mechanic for 40 years and had owned his own tractor repair business for 20 years. Belluomini Farms was his primary customer; he maintained their tractors, including the Caterpillar D7-C which injured him. He had rebuilt the D7-C tractor in 1982 when Belluomini Farms purchased it from another party.

Several days before the accident, Tom Belluomini brought the tractor to Willard's shop to repair a broken bolt. When he parked the tractor, Belluomini disengaged the master clutch and shut down the engine by using the governor to shut off fuel flow. He left the direction control lever in reverse and the gear selector lever in first or second gear. He did not set the parking brake.

On the morning of the accident, Willard did not follow his usual practice of ensuring that the direction control lever and the gear selector lever were disengaged. He also neglected to follow Caterpillar's recommended startup procedures by not locking the brake pedal and by placing the diesel fuel governor in the open position. He merely disengaged the master clutch, leaving the tractor in gear to move in reverse when the clutch was again engaged.

Willard started the pony engine and engaged it with the diesel. With the diesel engine cranking, Willard started it from the track rather than the cab because of damage to the starter pinion which had not been repaired. The pinion had to be held in place to sustain the connection between the pony engine and the diesel engine. When the diesel engine started, Willard knelt on the track and shut off the pony engine. The tractor then "took off" in reverse and the track drew Willard's legs and hips between the track and the fender. Willard suffered severe injuries to his pelvis, legs, and left arm. His medical expenses to date totaled $190,270.11.

Alvaro Lopez, who was working nearby, saw the tractor moving in reverse "a little bit faster than a person walking, but not running." Willard was lying on the ground 15 feet in front of the tractor. Lopez ran over and stopped the tractor within 25 or 30 seconds. By then the tractor was 60 feet from Willard. David Perales, who worked in Willard's repair shop, saw Willard on the ground as the tractor moved backwards. He described the speed of the machine as "creeping," "[y]ou could walk beside it."

*Design Defect and Negligence Claims*

Willard contended there were two significant design defects in the D7 tractor—the positioning of the operator on the track during the startup procedure coupled with a defective master clutch. The clutch of the D7, like the common automotive clutch, should, when disengaged, interrupt power to the drive train of the tractor. Under certain conditions, however, the D7's clutch failed to achieve the expected separation when disengaged. Even when the clutch was disengaged, the 27,000-pound tractor could move at approximately 2 miles per hour because of a phenomenon referred to as

clutch drag or fluid coupling. Willard contended the risks inherent in the wet clutch, combined with on-track starting, outweighed the benefits. Willard also contended the warnings provided were defective because they were placed improperly and did not accurately warn of the dangers. Caterpillar argued to the contrary.

(a) *The Wet Clutch and Clutch Drag*

Caterpillar did not dispute the existence of viscous oil clutch drag. Oil in a clutch housing becomes thicker as the temperature drops. At some point, the oil becomes sufficiently viscous to transmit power between the clutch plates even though they are not touching. Before his accident, Willard was unfamiliar with the term "clutch drag," but he was aware of the phenomenon. On two prior occasions, when he engaged the pinion connecting the pony engine to the diesel engine, he felt the track tighten and the tractor creep a bit. On both occasions, he immediately disengaged the pony engine from the diesel and made sure the transmission controls were disengaged.

Belluomini Farm's accident reconstructionist, Warren McElwain, testified that clutch drag is "the most likely" explanation for the inadvertent tractor movement that caused Willard's injuries. He explained that the function of a clutch is to interrupt the mechanical connection between the power from the engine and its conveyance through the clutch assembly into the transmission. He opined that a clutch design which permitted clutch drag was not necessarily a defect, but could be in the D7 when coupled with on-track starting.

Caterpillar's representative Balzer, an engineer, testified that clutch drag is an operating characteristic of all clutches. The function of a clutch is not to prevent unintended movements, but to allow the operator to shift gears. Thus, a clutch separates power only as needed for shifting. A "dry" clutch does not eliminate the risk of unintended movement due to clutch drag. Clutch drag can occur in a dry clutch because of manufacturing defect, maladjustment, warp, or mechanical damage and debris in the clutch compartment. Further, the wet clutch has advantages over the dry clutch. It wears better, requires less maintenance, and runs cooler thereby reducing the risk of warp and resultant clutch drag.

Balzer testified the weather conditions at the time of the accident were not conducive to clutch drag unless the clutch was improperly adjusted. The possibility of clutch drag decreases at temperatures above 30 degrees Fahrenheit, and inadvertent movement is very unlikely at temperatures above 60 degrees. The temperature at the time of the accident was about 60 degrees. Further, clutch drag should cause at least some movement when the pony

engine is first engaged to the diesel engine. However, the track did not tighten before Willard was injured. Finally, according to Balzer, the reported speed of the runaway tractor and the delay between the starting of the diesel engine and the track movement contradicted the possibility of viscous oil clutch drag.

Defense expert Joseph Geier, a Caterpillar operator/demonstrator, testified the inadvertent movement that caused Willard's injuries was more consistent with power transmission due to mechanical maladjustment of the clutch. Willard generally adjusted the clutch too tightly.

Willard made two videotapes demonstrating the startup of two other D7-C tractors with the gears and controls configured as they were on the day of the accident. Both tractors showed inadvertent movement despite the fact that the ambient air temperature was 60 degrees or above.

(b)   *On-track Starting*

McElwain testified the D7's wet clutch that permitted clutch drag coupled with on-track starting was a design defect. Willard contended that placing the operator on the tractor track during the startup procedure created an unnecessary safety hazard.

In 1968, Caterpillar developed a "design reference" entitled "VEHICLE SYSTEMS SAFETY ANALYSIS." Subpart F sets forth the safety analysis for a vehicle starting system:

"1.   Can all engines be started from the seat? If not, is there a safety system available 'that automatically prevents' machine movement until the operator consciously makes the machine move?

"2.   Can the engine(s) be started with:

"a.   Power train engaged?

"b.   Auxiliary drives engaged?

"c.   Controls in positions other than neutral or hold? . . ." The reference also stated that safety must be built into the product rather than viewed as an add-on attraction for which the customer is responsible.

According to Balzer, the analysis provided proposed guidelines to enable a designer to eliminate the risk of inadvertent movement of the tractor. The concept that safety must be built into the product reflected Caterpillar's

knowledge that more unskilled people were operating its products than in the past. Balzer conceded if the design reference preference for in-seat starting had been on the Belluomini Farm's D7 tractor, Willard's accident probably would have been prevented.

Over Caterpillar's objection, Willard presented evidence of a fatal accident in 1976 involving a 1958 model 583 Caterpillar pipelayer vehicle. The pipelayer is an adaptation of the D8 crawler tractor (a larger version of the D7) with a pony engine for starting the diesel engine. The 583 had the same basic starting design as the D7. Both require the operator to be on-track to start the pony engine. The 583, in contrast with the D7, was equipped with a dry clutch.

The vehicle operator, Johnny Robinson, left the pipelayer's clutch and track gears engaged (with the direction lever in reverse) and the compression release lever in the run position while starting its pony engine. When the pony engine was engaged to the diesel engine, the latter started immediately and the pipelayer tracks began to move in reverse. Robinson, who was standing on the track to start the pony, was drawn under the bridge supporting the pipelayer mechanism. He was crushed and died at the scene.

(c) *Warnings*

McElwain testified the warnings on the D7 tractor were inadequate. The metal plaque was not visible to a person starting the pony engine. Moreover, neither warning directly addressed the danger of clutch drag from fluid coupling. McElwain felt it was important to warn users the clutch might not separate power when disengaged, because it was foreseeable that users would expect it to do so. In addition, the otherwise detailed owner's manual for the 1955 D7 did not address the possibility of clutch drag, although the phenomenon was common knowledge in the industry. Finally, although the warning labels informed the user how to safely start the tractor, the most effective warnings are those that graphically illustrate the consequences of not following the warning.

Willard recalled seeing the metal caution plaque in the operator compartment but did not recall seeing the red warning label on the pony engine before he was injured. He knew that failure to disengage the transmission levers, even if the clutch was disengaged, could result in unwanted tractor movement.

(d) *Risk/Benefit Analysis*

McElwain testified that a design engineer goes through a three-step process when addressing product hazards. The engineer first attempts to

eliminate the hazard. If the danger cannot be eliminated by design, the engineer develops a guard to protect the user from the hazard. Third, if an effective guard cannot be implemented, the user is warned against the hazard. Warnings are a last resort because studies have shown the general effectiveness of warnings is poor.

Willard contended Caterpillar had several choices to address the design defects that resulted in his injuries. First, Caterpillar could have eliminated the hazard by placing the pony engine controls in the operator's compartment for "in-seat" starting. International Harvester and Allis-Chalmers offered in-seat starting on their tractors in 1955. Caterpillar began offering in-seat starting on its D7 tractor in 1959.

Second, Caterpillar could have provided a full-length fender or a work platform that kept the operator off the track during the startup procedure. In the alternative, Caterpillar could have installed an interlock device that prevented engine startup unless all controls were in a position to render the tractor incapable of movement. McElwain agreed such guards were "possibilities." Other Caterpillar tractor owners had modified their machines to provide work platforms because the owners perceived on-track starting as dangerous.

Caterpillar's experts conceded that in-seat starting was feasible in 1955 but testified the problems associated with it outweighed the benefits. The 1955 pony engines started with a hand crank because batteries were unreliable in cold weather and after jostling in heavy equipment. The pony engine crank was designed for the operator to stand on the left track and rotate the crank handle in a horizontal arc. The operator had to be able to manipulate the pony motor controls while using the crank. With in-seat starting, the crank would have had to have been placed in an awkward position at the seat or the operator would have had to travel repeatedly from the cab to the crank during starting. However, when Caterpillar switched to in-seat starting in 1959, the auxiliary hand crank was not eliminated.

McElwain, Balzer and Geier saw problems with the use of a full-length fender or an interlock. Since a tractor operator must be able to see the tracks, a full-length fender could only be about half as wide as the tracks. A narrow fender would create slip and fall hazards. A fender would also interfere with track oscillation which enables the D7 tractor to move across uneven surfaces. Interlock systems available in 1955 probably would not have survived on the tractor for the 35 years it had been in use. Additionally, owners and operators commonly disconnect interlocks instead of maintaining them, and interlocks themselves create problems when operators rely on the interlock system rather than follow safe operating procedures.

*Spoliation of Evidence*

(a) *Caterpillar's Design Documents*

Caterpillar generated records related to the development of its tractors and their component parts. For example, development of the wet clutch involved thousands of hours of testing before it was first offered in a tractor in 1953. Design engineers documented the results of those tests. The test records identified safety problems and most documented negative rather than positive aspects of the product. Balzer anticipated that one to two dozen test reports would have been created during development of the wet clutch.

After a product was in production, Caterpillar continued to monitor its performance in the field by several mechanisms. Customers called Caterpillar to report problems or to request advice, and Caterpillar's engineers periodically visited with customers in the field. Incident reports were prepared by Caterpillar dealers to inform Caterpillar of injuries or property damage associated with a product they had sold. Additionally, Caterpillar's product support group and legal department monitored products through warranty claims and lawsuits.

In preparation for trial, Willard requested that Caterpillar produce: (a) documents associated with, referred to, or relied upon in the wet clutch development, design, and testing; (b) documents associated with studies and/or analyses of the selection of the starting system utilized in the accident tractor design from a human factors point of view; and (c) studies and analyses with regard to the selection, testing, and analysis of the warning labels and/or instructions relating to the starting system.

Caterpillar's manager for technical support, Eugene M. Sweeney, searched all relevant documents but found only two drawings of the wet clutch and pump, the operation and maintenance guide, the parts book, and the specification sheet. He did not locate any historical documents responsive to the request. Balzer was unable to locate any documents addressing the safety history of the D7 tractor. He also did not locate any incident reports of problems associated with the pony engine and on-track starting.

Balzer testified that, currently, incident reports are kept for five years. The old prototype, preproduction, postproduction, and field follow-up test reports for the D7 tractor and its component parts probably had not been kept. Caterpillar retained such records only as long as a vehicle was in production. Although Caterpillar's vehicles evolve from the designs incorporated in predecessor vehicles, when developing a new product, design engineers

generally review only the test reports for the current product and one generation back. Thus, a 1955 test report would have no value to a design engineer in 1985. Balzer himself had authorized the destruction of noncurrent vehicle reports that had not been used in two years. These documents were not related to the D7 line of tractors, however.

### (b) Caterpillar's Document Destruction

Caterpillar has a "Technical Information Center" (TIC) in Peoria, Illinois that serves as a research library for its engineers. The TIC houses books, professional papers, magazines, government reports, university publications and approximately 40,000 internal reports. The internal reports consist of concept, experimental, preproduction and pilot production test reports, as well as product improvement and retrofit reports. The documents provide a detailed analysis of product development, testing and implementation. All technical documents are not stored at the TIC. The center retains only those reports with long-term value to Caterpillar's engineers.

In 1985, TIC supervisor Kay Cloyes, in consultation with research and design engineers, reduced to writing Caterpillar's previously unwritten document retention policy. The policy, entitled "Guidelines for Preparation and Management of Research and Engineering Technical Documents" (hereafter Guidelines), was adopted after review by Caterpillar's legal department. The Guidelines provided a four-step review process before documents were destroyed. Documents were reviewed every five to ten years. In sequence, review documents were routed to (1) the engineer or testing division that wrote them, (2) the person who requested the test report, (3) the patent department, and (4) the litigation support group. If any reviewer determined the document had value to Caterpillar, the reviewer terminated the routing and returned the document to the TIC, where it was kept for another five years before being reviewed again. Documents were discarded only if all reviewers felt they had no future value.

In the 1950's, documents were reviewed regularly and not kept beyond their useful life. However, by the 1980's, personnel cutbacks made document review for retention impossible. As a result, the written Guidelines were never implemented and no documents had been discarded pursuant to the policy since 1985.

Willard claimed Caterpillar destroyed the design development reports relevant to his case before he was injured. His spoliation claim rested on the testimony of Leon Decker and Gaela Gehring.

### (c) Leon Decker

Leon Decker was a librarian at the TIC from 1975 through 1989. He testified Caterpillar inventoried its internal reports in 1978 and 1979. At

least 100 documents existed for every major type of vehicle Caterpillar produced. Decker was not aware of a policy or practice of destroying test reports when a vehicle went out of production. He testified instead that, after products liability litigation "really started up," in the late 1960's or 1970's, Caterpillar's legal department ordered certain documents destroyed.

Decker's supervisor at the time, Carol Mulvaney, told Decker the documents were destroyed to keep them out of the hands of plaintiffs' lawyers. She told him the legal department wanted to burn all the reports. While Decker could not identify any particular document that was destroyed, he witnessed the "systematic destruction of documents." It was his "educated guess" that, prior to this destruction, there had been documents related to the design of the wet clutch for the D7 tractor.

According to Decker, Caterpillar also altered test reports in 1989. Original documents delivered to the TIC contained positive and negative handwritten comments. Caterpillar deleted the handwritten comments from reports so "plaintiff's lawyers would not see [them]." In addition, when the litigation department requested documents, the rule was that documents were to be sent "clean," without any comments on them, and the cover sheet on the report that indicated which engineers had reviewed it was removed, so opposing counsel would not know which Caterpillar employees had seen the document.

In 1985, when Ms. Mulvaney retired, Decker sought to be named supervisor. Instead, Caterpillar hired Kay Cloyes. Decker and Cloyes did not get along, and Caterpillar eventually discharged Decker in 1989. After he was fired, he requested his personnel file and discovered someone had removed the positive reports from it. He filed an unsuccessful age discrimination claim against Caterpillar and, at the time of trial, remained angry with Caterpillar.

(d) *Gaela Gehring*

Gaela Gehring worked as a summer intern for Caterpillar in 1989. She was assigned to the TIC under the supervision of Kay Cloyes. Her job responsibilities included removing or obliterating handwritten comments on technical documents generated in the 1930's through the early 1950's. Some comments could be erased or obliterated with correction fluid. She removed more extensive comments by making a photocopy of the original report with the comments covered with paper. If the comments were on a separate page, that page was removed and destroyed. Original documents with extensive comments were destroyed. The photocopied replacements were placed in a manila envelope with a new file number.

Gehring questioned Cloyes about the propriety of removing marginalia that seemed to be an integral part of the report, especially those that appeared to be important negative comments. Initially, Cloyes told her the comments were being removed for aesthetic purposes, to restore the documents to their original form. Later, Cloyes said Caterpillar did not want the comments used against them in court.

Gehring recalled that the reports, which ran from one to one hundred pages, concerned the durability and safety of different tractor parts and systems. She did not recall if any report referred to the D7 tractor, the pony engine, or the wet clutch.

In rebuttal, Cloyes testified that in 1989, she undertook a pilot project of microfilming documents created between 1930 and 1951. She had a small sample filmed, but the image quality was poor. She then experimented with document restoration. She assigned high school intern Gaela Gehring to erase handwritten marginalia from a set of documents that had not been used in four or five years. She directed Gehring to make high contrast photocopies and generally restore the reports as closely as possible to their original technical content. Approximately 300 to 500 documents were restored and microfilmed. The project was abandoned because the engineers were unhappy with the quality of documents obtainable from microfilm. The "restored" documents still exist. Willard did not request production of any of them, nor did his subject matter requests result in production of any of them.

*Jury Verdict*

The jury returned a special verdict finding: (1) there was a defect in design of the D7-C tractor; (2) the defect existed when the tractor left the possession of Caterpillar; (3) the defect was a cause of injury to plaintiff; (4) the tractor was being used in a manner reasonably foreseeable by Caterpillar; (5) Caterpillar was negligent; (6) its negligence was a cause of injury to plaintiff; (7) plaintiff also was negligent; (8) his comparative negligence contributed to his injuries; (9) plaintiff and Caterpillar were each 50 percent negligent—Belluomini Farms was not negligent; (10) Caterpillar had documentation relevant to the issues in this case at one time; (11) that documentation was subsequently destroyed; (12) at the time the documentation was destroyed, it was reasonably foreseeable litigation would involve those issues; (13) at the time the documentation was destroyed, Caterpillar was aware of that reasonably foreseeable litigation; (14) Caterpillar intentionally destroyed the relevant documentation because of reasonably foreseeable litigation; (15) plaintiff's ability to prove his case was substantially impaired by the destruction of the documentation; (16) there is a causal connection

between the document destruction and plaintiff's inability to prove this lawsuit; (17) plaintiff suffered economic damages of $707,098.11 and non-economic damages of $450,000; (18) the actions of Caterpillar did not exhibit malice, oppression or fraud by clear and convincing evidence.

## DISCUSSION

### 1. *Willard's Theory of Tort Liability Based on Intentional Spoliation of Evidence Should Not Have Been Submitted to the Jury.*

#### *Spoliation of Evidence*

Spoliation is the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence, in pending or future litigation. (Bruzzano, *Spoliation of Evidence in California* (1994) 24 Sw.U.L.Rev. 123; Katz & Muscaro, *Spoilage of Evidence—Crimes, Sanctions, Inferences and Torts* (1993) 29 Tort & Ins. L.J. 51, 52.) Spoliation occurs along a continuum of fault—ranging from innocent through the degrees of negligence to intentional conduct. (*Welsh* v. *U.S.* (6th Cir. 1988) 844 F.2d 1239, 1246.)

The traditional remedies for spoliation of evidence include: (1) a discretionary jury inference against the spoliator (e.g., Evid. Code, §§ 412, 413; *Walsh* v. *Caidin* (1991) 232 Cal.App.3d 159, 164-165 [283 Cal.Rptr. 326]; *Bihun* v. *AT&T Information Systems, Inc.* (1993) 13 Cal.App.4th 976, 994-995 [16 Cal.Rptr.2d 787]); (2) a charge of obstruction of justice (e.g., Pen. Code, § 135; *Smith* v. *Superior Court* (1984) 151 Cal.App.3d 491, 497-500 [198 Cal.Rptr. 829]); and (3) various discovery sanctions (e.g., Code Civ. Proc., § 2023; *Puritan Ins. Co.* v. *Superior Court* (1985) 171 Cal.App.3d 877 [217 Cal.Rptr. 602]). (And see, Katz & Muscaro, *op. cit. supra,* 29 Tort & Ins. L.J. 51, 53-54; Spencer, *Do Not Fold, Spindle or Mutilate: The Trend Towards Recognition of Spoliation As A Separate Tort* (1993-1994) 30 Idaho L.Rev. 37, 44.)

A fourth remedy provided by some courts is recognition of tort liability for spoliation of evidence. Of the jurisdictions that have addressed spoliation as an independent tort, several have accepted it. A few jurisdictions have expressly refused to adopt a spoliation cause of action. Others have recognized the existence of the tort but declined to adopt it in the case at issue for various reasons. (See Nolte, *The Spoliation Tort: An Approach To Underlying Principles* (1995) 26 St. Mary's L.J. 351, 359.)

*Evolution of the Tort*

### (a) *California*

The tort of intentional spoliation of evidence was first recognized in *Smith* v. *Superior Court, supra,* 151 Cal.App.3d 491. Smith was blinded when a wheel and tire flew off a passing van and crashed into the windshield of her car. The van was towed to the dealer, Abbott Ford, who had customized it with special wheels. Abbott Ford promised Smith's counsel it would maintain certain parts of the van for testing by Smith's experts. Thereafter, Abbott Ford lost or destroyed the parts, making it impossible for Smith's experts to pinpoint the cause of the failure of the wheel assembly on the van. Smith sued Abbott Ford for intentional spoliation of evidence, alleging it had intentionally destroyed physical evidence it had promised to preserve, and the loss of the evidence significantly prejudiced her opportunity to recover damages for her injuries. The trial court sustained the dealer's demurrer, but the appellate court held that a cause of action for the tort of intentional spoliation of evidence had been stated. (*Id.* at pp. 495-496.)

Relying on case law recognizing a cause of action for intentional interference with prospective business advantage, the court held that a cause of action may be stated for intentional spoliation of evidence needed for a prospective or pending products liability suit. (*Smith* v. *Superior Court, supra,* 151 Cal.App.3d at pp. 501-502.) The court reasoned that a prospective civil action is a valuable "probable expectancy" that should be protected from intentional interference. Abbott Ford's intentional loss of relevant evidence interfered with Smith's opportunity to recover damages for her injuries. Thus, public policy dictated that Smith's interest in her prospective civil litigation was entitled to legal protection against Abbott Ford's intentional spoliation of evidence, even though her damages could not be stated with certainty. (*Id.* at pp. 502, 503.)

A year later, the *Smith* reasoning was applied to a case of accidental destruction of evidence in *Velasco* v. *Commercial Bldg. Maintenance Co.* (1985) 169 Cal.App.3d 874 [215 Cal.Rptr. 504]. The *Velasco* plaintiffs were injured by an exploding bottle. They alleged they took the fragments of the bottle to an attorney, who put them in an unmarked bag which he left on his desk. Employees of defendant maintenance company negligently disposed of them while cleaning the attorney's office. The court held that a cause of action may be stated for negligent destruction of evidence needed for prospective civil litigation. (*Id.* at p. 877.)

Subsequent decisions have provided little detail regarding the contours of these torts. *Reid* v. *State Farm Mut. Auto. Ins. Co.* (1985) 173 Cal.App.3d

557 [218 Cal.Rptr. 913] held that an insurer had no duty to preserve as evidence the damaged motor vehicle absent a specific request from the insured to do so. (*Id.* at p. 580.)

*Walsh* v. *Caidin, supra,* 232 Cal.App.3d 159, held that defendants in a wrongful death/medical malpractice action could not state a cause of action for spoliation of evidence against the surviving plaintiff spouse who had decedent's body cremated despite defendants' request for an autopsy. The surviving spouse had sole authority over disposition of the remains, defendants had no legal right to an autopsy for civil discovery purposes, and the spouse and her attorney owed defendants no duty to preserve evidence because the law did not treat a human body as merely another form of evidence. (*Id.* at pp. 162, 164.)

In *Continental Casualty Co.* v. *Superior Court* (1987) 190 Cal.App.3d 156, 162 [235 Cal.Rptr. 260], the court held that the workers' compensation exclusive remedy provision barred an injured employee's claim for negligent spoliation of evidence against the insurer who failed to preserve the ladder on which he was injured for use as evidence in a potential third party product liability suit. *Coca-Cola Bottling Co.* v. *Superior Court* (1991) 233 Cal.App.3d 1273 [285 Cal.Rptr. 183] reached the opposite conclusion and held the exclusive remedy provision did not bar a similar claim. (*Id.* at p. 1292.) *Jablonski* v. *Royal Globe Ins. Co.* (1988) 204 Cal.App.3d 379 [251 Cal.Rptr. 160] held where the intentionally destroyed evidence relates to a cause of action outside the sphere of workers' compensation, an action for intentional spoliation of evidence lies against the insurer. (*Id.* at pp. 393-394.)

Finally, *Augusta* v. *United Service Automobile Assn.* (1993) 13 Cal.App.4th 4 [16 Cal.Rptr.2d 400] held that the two-year statute of limitations of Code of Civil Procedure section 339, subdivision 1 (obligation or liability not founded on written instrument) applies to a cause of action for spoliation of evidence resulting from the loss of a speedometer in a wrecked vehicle. (13 Cal.App.4th at p. 10.)

### (b)  *Other Jurisdictions*

In addition to California, Alaska, Florida, Illinois, and Kansas have recognized a civil action for spoliation of evidence. (*Hazen* v. *Municipality of Anchorage* (Alaska 1986) 718 P.2d 456, 463-464; *Bondu* v. *Gurvich* (Fla.Dist.Ct.App. 1984) 473 So.2d 1307, 1312; *Rodgers* v. *St. Mary's Hosp. of Decatur* (1992) 149 Ill.2d 302 [173 Ill.Dec. 642, 597 N.E.2d 616, 620]; *Foster* v. *Lawrence Memorial Hosp.* (D.Kan. 1992) 809 F.Supp. 831, 838.)

Ohio and New Jersey recognize a tort of fraudulent destruction of evidence analogous to intentional spoliation of evidence. (*Smith* v. *Howard Johnson Co., Inc.* (1993) 67 Ohio St.3d 28 [615 N.E.2d 1037, 1038]; *Hirsch* v. *General Motors Corp.* (1993) 266 N.J.Super. 22 [628 A.2d 1108, 1115]; *Viviano* v. *CBS, Inc.* (1991) 251 N.J.Super. 113 [597 A.2d 543, 548-549.].) North Carolina recognizes a cause of action for plaintiff's increased costs of investigation stemming from defendants' alteration of medical records. (*Henry* v. *Deen* (1984) 310 N.C. 75 [310 S.E.2d 326, 334-335].)

Several courts have refused to recognize the spoliation tort for policy reasons. (*Gardner* v. *Blackston* (1988) 185 Ga.App. 754 [365 S.E.2d 545, 546]; *Weigl* v. *Quincy Specialties Co.* (1993) 158 Misc.2d 753 [601 N.Y.S.2d 774, 776]; *Baugher* v. *Gates Rubber Co., Inc.* (Mo.Ct.App. 1993) 863 S.W.2d 905, 909, 911-912.) Others declined to adopt the tort on the ground traditional remedies for the destruction of evidence were sufficient to protect spoliation victims and to deter future wrongdoers. (*Miller* v. *Montgomery County* (1985) 64 Md.App. 202 [494 A.2d 761, 768]; *Wilder-Mann* v. *United States* (D.D.C., June 28, 1993) 87-2392 & 90-2136.)

Finally, other courts have addressed, but not adopted, the spoliation tort for various reasons particular to the case before them. (*La Raia* v. *Superior Court, etc.* (1986) 150 Ariz. 118 [722 P.2d 286, 289] [availability of alternative remedies]; *Unigard Sec. Ins.* v. *Lakewood Engineering & Mfg.* (9th Cir. 1992) 982 F.2d 363, 371 [facts of case did not indicate injury to defendant from plaintiff's spoliation]; *Federated Mut.* v. *Litchfield Prec. Comp.* (Minn. 1990) 456 N.W.2d 434, 439 [cause of action for spoliation was "premature" because damage to insurer's subrogation claim was speculative]; accord, *Kent* v. *Costruzione Aeronautiche Giovanni Agusta, S.P.A.* (E.D.Pa., Sept. 20, 1990) 90-2233 [action premature]; *Murray* v. *Farmers Ins. Co.* (1990) 118 Idaho 224 [796 P.2d 101, 107] [no causation]; *Murphy* v. *Target Products* (Ind.Ct.App. 1991) 580 N.E.2d 687, 688-689 [employer has no duty to preserve *potential* evidence for employee's possible third party action]; accord, *Panich* v. *Iron Wood Products Corp.* (1989) 179 Mich.App. 136 [445 N.W.2d 795, 797]; *Diehl* v. *Rocky Mountain Communications* (Tex.Ct.App. 1991) 818 S.W.2d 183, 184; *Edwards* v. *Louisville Ladder Co.* (W.D.La. 1992) 796 F.Supp. 966; *Wilson* v. *Beloit Corp.* (8th Cir. 1990) 921 F.2d 765 [absent special relationship or duty arising by reason of contract, statute or other special circumstance, no obligation to preserve possible evidence for another party to aid that party in future litigation against another]; and see Annot., Intentional Spoliation of Evidence, Interfering With Prospective Civil Action, As Actionable (1989) 70 A.L.R.4th 984.)

*Elements of the Tort*

No reported California case articulates the elements of intentional spoliation. In those out-of-state cases which have done so, the common elements

are: (1) pending or probable civil litigation, (2) defendant's knowledge that litigation is pending or probable, (3) willful destruction of evidence, (4) intent to interfere with plaintiff's prospective civil suit, (5) a causal relationship between the evidence destruction and the inability to prove the lawsuit, and (6) damages. (*Foster* v. *Lawrence Memorial Hosp.*, *supra*, 809 F.Supp. at p. 836; *Smith* v. *Howard Johnson Co., Inc.*, *supra*, 615 N.E.2d at p. 1038.)[2]

The jury in this case was instructed that liability could be imposed as follows:

"The essential elements which must be proved by the plaintiff to recover damages [for intentional spoliation of evidence] are:

"(1) that documentation relevant to the issues in this case at one time existed;

"(2) that documentation relevant to the issues in this case was subsequently destroyed;

"(3) that at the time documentation relevant to the issues in this case was destroyed it was reasonably foreseeable litigation would involve those issues;

"(4) that at the time of the document destruction, Caterpillar was aware of the reasonably foreseeable litigation;

"(5) that at the time of the document destruction, Caterpillar intentionally destroyed the relevant documentation because of reasonably foreseeable litigation;

"(6) that plaintiff's ability to prove his case has been substantially impaired by the destruction of the documentation;

"(7) that there is a causal connection between the document destruction and plaintiff's inability to prove this lawsuit; and

"(8) Damages caused in substantial part by the acts of CATERPILLAR in destroying such evidence."

*Contentions of the Parties*

Caterpillar contends the trial court erroneously expanded the tort of intentional spoliation of evidence by applying it to the facts of this case.

---

[2]Compare BAJI No. 7.95 (8th ed. 1994).

Further, competing policies require judicial limitation of the tort to prevent it from imposing unfair results and excessive social costs. Caterpillar urges the court to limit liability for intentional spoliation of evidence to those product liability cases where (1) the product itself is destroyed, and/or (2) the spoliation occurs after the manufacturer has notice that its product caused injury or its documents are material evidence. Amicus curiae Products Liability Advisory Council, Inc., asks the court to bar tort liability in the absence of an agreement or other duty to preserve evidence, and to hold that a plaintiff cannot pursue a spoliation cause of action prior to the resolution of his underlying claim.

Willard submits the court properly applied spoliation tort law, the public policies underlying the tort favor the imposition of liability in this case, and the spoliation instruction given correctly advised the jury of the elements of this cause of action.

### Contours of the Tort

Caterpillar asserts that liability for spoliation of evidence should be limited by the concept of duty. That is, the court should apply the traditional duty analysis usually invoked in negligence cases to determine whether one person owes a duty to another: the extent to which the transaction was intended to affect the plaintiff, the foreseeability of harm, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to defendant's conduct, the extent of the burden to the defendant and the consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost and prevalence of insurance for the risk involved. (*Bily* v. *Arthur Young & Co.* (1992) 3 Cal.4th 370, 397 [11 Cal.Rptr.2d 51, 834 P.2d 745]; *Tarasoff* v. *Regents of University of California* (1976) 17 Cal.3d 425, 434 [131 Cal.Rptr. 14, 551 P.2d 334, 83 A.L.R.3d 1166].) Caterpillar submits, under this analysis, a manufacturer's duty to preserve evidence for future plaintiffs is limited to preserving the injury-causing product itself and the relevant documentary evidence in existence when the plaintiff notifies the manufacturer of his injury, damage or claim.

Willard questions the applicability of the duty factors to the determination of the scope of liability for intentional spoliation of evidence, the conduct at issue in this case.

The applicable analytic framework is found in Prosser's treatise on torts and the Restatement Second of Torts. ■ Torts are breaches of duties

fixed and imposed by the law itself. They reflect a determination that plaintiff's interests are entitled to legal protection against the conduct of defendant. (Prosser & Keeton, The Law of Torts (5th ed. 1984) § 1, p. 4 [hereafter Prosser].) Tort law imposes duties on persons to act in a manner that will not injure others. (Prosser et al., Cases & Materials on Torts (8th ed. 1988) p. 1.) A tort, whether intentional or negligent, involves a violation of a legal duty owed by the defendant to the person injured. (5 Witkin, Summary of Cal. Law (9th ed. 1990) Torts, § 6, p. 61.)

According to Prosser, "the law of torts is a battleground of social theory." (Prosser, *op. cit. supra*, § 3, p. 15.) In developing tort law, courts attempt to strike some reasonable balance between the plaintiff's claim to protection and the defendant's claim to freedom of action for defendant's own ends, and those of society. (*Id.* at p. 6.) The balancing process to determine whether liability for intentional tortious conduct should be imposed is set forth in section 870 of the Restatement Second of Torts. The balancing process is analogous, but not identical, to that involved in determining whether a duty should lie for negligent conduct.

Section 870 of the Restatement Second of Torts provides: "One who intentionally causes injury to another is subject to liability to the other for that injury, if his conduct is generally culpable and not justifiable under the circumstances. This liability may be imposed although the actor's conduct does not come within a traditional category of tort liability." The comments to section 870 explain its nature and scope:

"a. *Nature of Section.* This Section is intended to supply a generalization for tortious conduct involving harm intentionally inflicted. Generalizations have long existed for negligence liability, involving conduct producing unreasonable risk of harm to others . . . , and for strict liability, involving the carrying on of an activity that is abnormally dangerous. . . . As for conduct intentionally causing harm, however, it has traditionally been assumed that the several established intentional torts developed separately and independently and not in accordance with any unifying principle. This Section purports to supply that unifying principle and to explain the basis for the development of the more recently created intentional torts. More than that, *it is intended to serve as a guide for determining when liability should be imposed for harm that was intentionally inflicted,* even though the conduct does not come within the requirements of one of the well established and named intentional torts.

". . . . . . . . . . . . . . . . . . . . . . . . .

"b. *Intentionally causing harm.* An intentional tort is one in which the actor intends to produce the harm that ensues; it is not enough that he intends

to perform the act. He intends to produce the harm when he desires to bring about that consequence by performing the act. As indicated in § 8A, he also is treated as intending that consequence if he knows or believes that the consequence is certain, or substantially certain, to result from his act. In some cases in which the claim may be entirely novel the court may decide to limit the liability to the situation in which the defendant acted for the purpose of producing the harm involved.

".  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .

"c.  *Balancing of interests.* Tort law involves a balancing of the conflicting interests of the litigants in the light of the social and economic interests of society in general. In the cases of negligence and strict liability, this balancing process takes place in the application of the standard involved (conduct creating an unreasonable risk of harm, or activity that is abnormally dangerous). . . .

"For the established intentional torts, this balancing process has been already worked out and developed in the form of a set of rules. The individual torts have been set up to protect interests of the injured party, with their individual attributes designated by legal rules. The interests of the actor are protected by a set of established privileges, with their individual attributes also established by legal rules. There is thus no need of using the balancing process afresh for each case in which an established tort exists; and the task is merely to apply the legal rules to the facts.

"d.  *Relationship to established torts.* Thus the established intentional torts and their established legal privileges amount to crystalizations of the general principle stated in this Section. In determining whether liability should be imposed in a particular case for an established intentional tort, neither court nor jury engages afresh in balancing the conflicting interests of the parties. . . . [A]ll that is needed is to determine the facts and apply these rules to them.

"In many situations in which liability has been imposed under the principle stated in this Section, newly recognized categories of intentional tort have been developed or are still in the process of development. A prime example of a tort presently not fully developed is intentional infliction of emotional distress; its contours are not yet fully clear. . . . Other categories of fairly recent development include injurious falsehood, interference with contractual relations and interference with prospective economic advantage. The more mature the stage of development the more definite the contours of the tort and of the privileges that may be defenses to it." (Rest.2d Torts, *supra*, § 870, coms. a-d, pp. 279-281, italics added.)

The foregoing comment d of the Restatement Second of Torts section 870 describes the state of affairs surrounding the tort under consideration—spoliation of evidence. As our previous discussion shows, the tort, which has met with a mixed level of acceptance in the various jurisdictions considering it, is in its early stages of development. Its contours are far from clear. (See com. to BAJI No. 7.95 (8th ed. 1994 bound vol.) p. 396 [intentional spoliation of evidence "is a new tort, and its parameters are not completely known"].) For example, as far as we can tell none of the reported cases addressing the tort have involved, as this case does, the destruction or spoliation of evidence *before* the injury giving rise to the underlying prospective claim for damages. Thus, we find the Restatement's analysis particularly instructive and helpful here.

The comments to section 870 of the Restatement Second of Torts suggest a specific, four-factor balancing process for determining whether tort liability should be imposed in a case such as this.

"e.  *Basis for liability.* Obviously, it is not every intentionally-caused harm that deserves a remedy in tort. The determination of which ones should be the subject of tort liability is made by resorting to the balancing process . . . [¶ [involving] four factors . . . (1) the nature and seriousness of the harm to the injured party, (2) the nature and significance of the interests promoted by the actor's conduct, (3) the character of the means used by the actor and (4) the actor's motive. The first factor is of primary concern in applying the blackletter term, injury, and the second factor is of primary concern in applying the blackletter term, not justifiable; the first, third and fourth factors are of substantially equal significance in applying the blackletter term, culpable. The balancing process, however, necessarily involves one single determination, and it cannot be neatly divided into several separate, mutually exclusive determinations. . . ." (Rest.2d Torts, *supra*, § 870, com. e, pp. 281-282.)

Subsequent comments discuss each of the four factors.

"f.  *Nature and seriousness of the harm to the injured party.* There are many harms that individuals must bear as the price of living in a society composed of many individuals. The law cannot undertake to protect people from the hurt feelings incident to the give and take of daily life. . . ." (Rest.2d Torts, *supra*, § 870, com. f, p. 283.) Thus, different types of harm are accorded varying levels of protection. Physical harm to the person or to property weigh heavy. Harm to existing advantageous relations weighs less heavily than physical harm, and harm to prospective pecuniary interests, less heavily still. (*Ibid.*)

"g. *The interests promoted by the actor's conduct.* These interests are the ones that have become the basis for established privileges. . . . The importance of these interests to the owner and to society is a significant factor in the balancing process. . . .

". . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

"h. *Character of the means used by the actor.* The actor's conduct is the means by which he imposes the harm upon the injured party. The reference is to the moral and legal character of that conduct. If the means is illegal or unfair or immoral according to the common understanding of society this constitutes a factor favoring liability. . . . [¶] [A]cts that are in violation of civil or criminal statutes or that are tortious with respect to third parties may be strongly indicative of liability.

"i. *Actor's motive.* If the only motive of the actor is a desire to harm the plaintiff, this fact becomes a very important factor. A motive of this sort is sometimes called disinterested malevolence, to indicate that the defendant has no interests of his own to promote by his conduct, other than venting his ill will. It is sometimes said that an evil motive cannot make tortious an act that is otherwise rightful. The nature of the motive, however, may be a factor that tips the scale in determining whether the liability should be imposed or not.

"The actor's purpose may also be significant. For some torts it may be held not to be sufficient that the actor knew that his conduct was substantially certain to produce the injury, and it may be necessary that he desired to bring it about." (Rest.2d Torts, *supra*, § 870, coms. g-i, pp. 284-285.)

The Restatement's comments address other issues which will arise separately from the suggested balancing process.

"j. *Form of the innominate tort.* If a balancing of the conflicting interests, with consideration of the factors listed above, produces the conclusion that tort liability is appropriate for the type of situation that is presently before the court, the question still remains as to what form the new tort should take. . . .

". . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

"Recognized privileges for the established torts that are most analogous to the newly-created tort will usually be held applicable to the new tort, but a deliberate decision must be made as to this issue.

" . . . . . . . . . . . . . . . . . . . . .

"k.  *Functions of judge and jury.* It is the function of the judge to engage in the process of applying the factors listed above in balancing the interests to determine whether tort liability will exist for the type of injury that the defendant has imposed on the plaintiff and what privileges will apply. It is the province of the jury to apply the rules and standards laid down by the judge to the facts that it finds to exist.

" . . . . . . . . . . . . . . . . . . . . .

"l.  *Causation.* For liability to exist, the defendant's conduct must have been the cause in fact of the harm to the plaintiff. . . .

"m.  *Damages.* . . . [P]roof of actual harm is required. . . ." (Rest.2d Torts, *supra*, § 870, coms. j-m, pp. 285-286.)

Applying the Restatement guidelines to the determination of whether liability for intentional spoliation of evidence should be imposed for the destruction of documents in this case yields the following.

(a)  *Intentionally Caused Harm*

■  In tort law, "intent" means a state of mind about the consequences of an act, not about the act itself. Intent is broader than a desire or purpose to bring about physical results. It extends not only to those consequences which are desired, but also to those which the actor believes are substantially certain to follow from what the actor does. (Prosser, *op. cit. supra*, § 8, p. 34; and see *Shell Oil Co.* v. *Winterthur Swiss Ins. Co.* (1993) 12 Cal.App.4th 715, 742 [15 Cal.Rptr.2d 815]; *Cole* v. *Fair Oaks Fire Protection Dist.* (1987) 43 Cal.3d 148, 169 [233 Cal.Rptr. 308, 729 P.2d 743], fn. 5 (dis. opn. of Bird, C. J.).)

Decker testified Caterpillar destroyed design documents to make them unavailable to potential plaintiffs. Such evidence demonstrates more than Caterpillar's intent to destroy old documents. It evinces a desire to produce the harm that results—interference with the ability of future products liability plaintiffs to prove their claims against Caterpillar. ■  Accordingly, the intent element of Willard's spoliation cause of action was supported by substantial evidence. Whether that theory of liability should have been submitted to the jury, then, requires applying the balancing process suggested by the Restatement.

(b)  *Basis of Liability—Balancing of Interests*

(1)  *Nature and seriousness of the harm to the injured party:* Spoliation of evidence interferes with a party's "probable expectancy" of winning his

lawsuit and obtaining compensation for his injuries. (*Smith* v. *Superior Court, supra,* 151 Cal.App.3d at pp. 502-503.) The measure of harm is the effect of the spoliation on the plaintiff's ability to establish his case. (Pofahl, *Smith* v. *Superior Court: A New Tort of Intentional Spoliation of Evidence* (1985) 69 Minn. L.Rev. 961, 982.) The harm flowing from spoliation is to a prospective pecuniary interest, a "less heavily" protected harm under the Restatement. (Rest.2d Torts, *supra,* § 870, com. f, p. 283.) However, when the prospective economic harm impacts the plaintiff's ability to obtain compensation for physical harm to his person, the economic harm may be deserving of more weight in the determination of whether to impose tort liability.

In this case, the harm to Willard was the loss of product design documents that probably demonstrated Caterpillar's risk/benefit analysis and design decisions for the 1955 model D7-C tractor. Such documents would have been relevant to the issues of design defect, negligence, and punitive damages. ▮ In a products liability action, the plaintiff may prove a design defect in one of two ways. He may show the product failed to perform as safely as an ordinary consumer would expect when it was used in a reasonably foreseeable manner, a theory not at issue in this case. In the alternative, he may establish a defect by showing the risk of danger inherent in the challenged design outweighed the benefits of the design. (*Barker* v. *Lull Engineering Co.* (1978) 20 Cal.3d 413, 430 [143 Cal.Rptr. 225, 573 P.2d 443, 96 A.L.R.3d 1].) Once the plaintiff makes a prima facie showing that the injury was proximately caused by the product's design, the burden shifts to the defendant to prove the product is not defective in light of relevant factors. (*Id.* at p. 431.) Those factors include the gravity of the danger posed by the challenged design, the likelihood that such danger would occur, the mechanical feasibility of a safer alternative design, the financial cost of an improved design, and the adverse consequences to the product and to the consumer that would result from an alternative design. (*Ibid.*)

▮ In this case, Willard argued the missing documents would have shown Caterpillar was aware of clutch drag as an operational characteristic of the D7 master clutch, evaluated this feature in light of the on-track starting procedure, and was aware of the danger inherent in the combination. Willard also believed the documents would have provided evidence relevant to the issue of punitive damages—the degree and extent of Caterpillar's knowledge of the defects which caused Willard's injuries, and its conscious disregard for the safety of others by failing to retrofit older tractors with in-seat starting when that technology was incorporated into Caterpillar's tractors.

However, that Willard was injured by a tractor that had been in use for 35 years diminished the harm resulting from the absent documents. When a

product has been on the market for many years (in this case, more than half of its expected operational life), the manufacturer's theoretical risk/benefit analysis and/or conscious disregard for the safety of users should be manifested in real life experience. For example, if the tractor's design in theory and in fact posed a substantial risk of bodily injury to the user, plaintiff should be able to acquire data regarding actual injuries to support an inference that the designer's test reports indicated the same risks. In other words, secondary evidence—the actual incidental history of the D7-C tractor—should be available to demonstrate the probable contents of the missing documents. The fact thousands of the tractors were in use for up to 35 years before a claim of injury arose from the on-track starting procedure demonstrates the unlikelihood that the design reports revealed any otherwise unavailable information as to the risk of such injury.

There was no dispute that the on-track starting feature involved a risk of injury to the operator. The principal liability issues addressed in Willard's strict liability and negligence causes revolved around the viscous oil clutch drag phenomenon, the preventive measures Caterpillar designed into the starting procedure, and whether the risk of danger inherent in the challenged design outweighed the benefits. Willard presented substantial evidence on all those issues. Even without the documents which presumably contained relevant information, he was in a far stronger position than, for example, the plaintiff in *Smith* v. *Superior Court, supra,* 151 Cal.App.3d 491 where the missing vehicle parts were necessary to determine the cause of the wheel assembly failure which led to the plaintiff's injuries. (*Id.* at pp. 494-495.)

Therefore, the seriousness of the harm to Willard from Caterpillar's document destruction in this case does not weigh in favor of imposing liability.

(2) *Interest promoted by the actor's conduct:* A number of legal writers recognize that spoliation liability interferes with individual property rights and imposes potentially onerous storage burdens. (See, e.g., Nolte, *The Spoliation Tort: An Approach To Underlying Principles, supra,* 26 St. Mary's L.J. at p. 399; Spencer, *Do Not Fold, Spindle or Mutilate: The Trend Towards Recognition of Spoliation As A Separate Tort, supra,* 30 Idaho L. Rev. 37; Solum & Marzen, *Truth and Uncertainty: Legal Control of the Destruction of Evidence* (1987) 36 Emory L.J. 1085, 1140-1142.) That observation is particularly apt under the circumstances of this case.

The "evidence" Caterpillar destroyed was its own property—records and reports which it generated for its own purposes and use. Willard has not shown that Caterpillar was under any statutory or regulatory duty to preserve

the documents for any period of time. When the document destruction program began in 1978-1979, the documents pertained to a tractor which had been out of production for nearly 20 years. There were no known claims or actions as to which the documents might be relevant.

The first court which recognized spoliation of evidence as a tort likened it to another established tort, interference with prospective business advantage. (*Smith* v. *Superior Court, supra,* 151 Cal.App.3d at p. 501.) That tort, itself, is an extension of the basic principle underlying the tort of inducing breach of contract. (See 5 Witkin, Summary of Cal. Law, *supra,* Torts, § 652, p. 740.) Numerous privileges are recognized as defenses in such cases. (*Id.* at §§ 666-673, pp. 762-775.) Whether similar privileges will apply in spoliation cases remains to be seen.

We need not decide whether the destruction of one's own records is a privileged act and, if so, whether the privilege is absolute or qualified. It is enough here that we simply acknowledge that Caterpillar promoted its own legitimate interest when it disposed of the documents. This factor accordingly weighs in Caterpillar's favor in applying that portion of Restatement Second of Torts section 870's rule requiring that conduct be "not justifiable under the circumstances" before intentional tort liability may be imposed.

(3) *Character of the means used by the actor:* This factor bears directly on the requirement of Restatement Second of Torts section 870 that the conduct subjecting one to intentional tort liability must be "generally culpable." According to the Restatement's drafters, "[t]he conduct must first be improper or wrongful; it must be blameworthy, not in accord with community standards of right conduct." (Rest.2d Torts, *supra,* § 870, com. e, p. 282.)

Our Supreme Court recently applied this principle to the tort of intentional interference with economic relations when it held that "a plaintiff seeking to recover for alleged interference with prospective economic relations has the burden of pleading and proving that the defendant's interference was wrongful 'by some measure beyond the fact of the interference itself.' " (*Della Penna* v. *Toyota Motor Sales, U.S.A., Inc.* (1995) 11 Cal.4th 376, 392-393 [45 Cal.Rptr.2d 436, 902 P.2d 740], fn. omitted.) Because the spoliation tort is generally recognized as an offshoot of interference with prospective economic relations, we have no doubt that the *Della Penna* rule applies here. The Supreme Court, however, did not define the "wrongfulness" standard. (*Ibid.*) Thus, we will examine Caterpillar's conduct in light of the Restatement's suggestion that conduct which is "illegal or unfair or immoral according to the common understanding of society" may subject one to tort liability. (Rest.2d Torts, *supra,* § 870, com. h, p. 284.)

The destruction of product design documents is a neutral act. Thus, the character of such document destruction—whether illegal, unfair, immoral or not—is tied to, among other things, its timing. At one end of the liability continuum, Penal Code section 135 makes it illegal to willfully destroy documentary evidence as it "is about to be produced in evidence" for trial. Moving down the continuum, the vast majority of courts that have considered the issue hold that the products liability defendant's intentional destruction of relevant evidence after notice of the plaintiff's injury and contemplated litigation is sanctionable. Their rulings represent a "common understanding of society" that such conduct is "unfair or immoral." (See, e.g., *Smith* v. *Superior Court, supra,* 151 Cal.App.3d at p. 503; *Capellupo* v. *FMC Corp.* (D.Minn. 1989) 126 F.R.D. 545; *Hazen* v. *Municipality of Anchorage, supra,* 718 P.2d at p. 463; *Viviano* v. *CBS, Inc., supra,* 597 A.2d at pp. 548-550.)

Further down the continuum into the realm of prelitigation spoliation, a few courts have considered the propriety of sanctioning a litigant for such conduct. In *Carlucci* v. *Piper Aircraft Corp.* (S.D.Fla. 1984) 102 F.R.D. 472, a wrongful death action alleging various design defects relating to the longitudinal stability of the aircraft, the court entered Piper's default based, in part, on its prelitigation destruction of design documents. In the 1960's and 1970's, Piper's flight test engineers were instructed to purge the department files and eliminate documents that might prove detrimental to Piper in a lawsuit. Thereafter, the destruction of potentially harmful documents was an ongoing process. The court noted that good faith disposal pursuant to a bona fide consistent and reasonable document retention policy could justify a failure to produce documents in discovery. However, sanctions were appropriate where one party intentionally prevented the fair adjudication of the case by deliberately destroying documents. (*Id.* at pp. 481-482, 486; accord, *Wm. T. Thompson Co.* v. *General Nutrition Corp.* (C.D.Cal. 1984) 593 F.Supp. 1443, 1455; *Synanon Church* v. *United States* (D.D.C. 1984) 579 F.Supp. 967, 972-974.)

*Lewy* v. *Remington Arms Co., Inc.* (8th Cir. 1988) 836 F.2d 1104 considered whether the jury should be instructed with the spoliation inference when the spoliator asserts that documents were destroyed pursuant to a routine record retention policy. The court held that the propriety of giving the instruction depended on: (1) whether the policy was reasonable considering the facts and circumstances surrounding the relevant documents. For example, a three-year retention policy may be reasonable for appointment books and telephone messages, but not for customer complaints of product defects; (2) whether lawsuits concerning a complaint or related complaints have been filed, the frequency of such complaints and the magnitude of the

complaints; and (3) whether the policy was instituted in bad faith, i.e., to limit damaging evidence available to plaintiffs. The court added, the spoliation inference may also be proper where the corporation knew or should have known that the destroyed documents would become material at some point in the future. (*Id.* at pp. 1111-1112.)

Federal courts consider the conduct of a party prior to the commencement of the litigation in determining whether a party's failure to comply with a production order is willful or in bad faith. If, prior to litigation, a party " 'deliberately courted legal impediments to production,' " it cannot then be heard to assert its good faith after the expectation is realized. For conduct to constitute "courting legal impediments," it was not necessary that the actual litigation in which the documents are ordered produced be pending or specifically contemplated. " 'Although a potential litigant is under no obligation to preserve every document in its possession, whatever its degree of relevance, prior to the commencement of a lawsuit, . . . some duty must be imposed in circumstances such as these lest the fact-finding process in our courts be reduced to a mockery.' " (*General Atomic Co.* v. *Exxon Nuclear Co., Inc.* (S.D.Cal. 1981) 90 F.R.D. 290, 295-296, 299, 304 [party housed its cartel documents in Canada, whose law precluded their release, in anticipation of antitrust litigation in the United States].) The proper inquiry is whether the defendant, with knowledge that the lawsuit would be filed, willfully destroyed documents which it knew or should have known would constitute evidence relevant to the case. (*Wm. T. Thompson Co.* v. *General Nutrition Corp., supra*, 593 F.Supp. at p. 1445.)

Finally, at the other end of the spoliation liability continuum, some courts have held there is no liability for failing to preserve documents before a party has notice of their relevance to litigation likely to be commenced. One court noted that the potential for litigation arises at the moment of injury, but the injured party may not contemplate filing a lawsuit. Therefore, discovery sanctions for spoliation of evidence are warranted only if evidence was destroyed when the products liability action was contemplated rather than merely possible. (*Iowa Ham Canning, Inc.* v. *Handtmann, Inc.* (N.D.Ill. 1994) 870 F.Supp. 238, 244; and see *Akiona* v. *U.S.* (9th Cir. 1991) 938 F.2d 158, 160-161 [sanctions not warranted unless party had some notice the documents were potentially relevant]; *PBA Local No. 38* v. *Woodbridge Police Dept.* (D.N.J. 1993) 832 F.Supp. 808, 833-834 [no spoliation of evidence where tape recordings at issue were routinely taped over four or five years before litigation commenced].)

These cases demonstrate the "common understanding of society" regarding the wrongfulness of evidence destruction is tied to the temporal proximity between the destruction and the litigation interference and the foreseeability of the harm to the nonspoliating litigant resulting from the

destruction. There is a tendency to impose greater responsibility on the defendant when its spoliation will clearly interfere with the plaintiff's prospective lawsuit and to impose less responsibility when the interference is less predictable.

Therefore, if Caterpillar destroyed documents which were routinely requested in ongoing or clearly foreseeable products liability lawsuits involving the D7-C tractor and claims similar to Willard's, its conduct might be characterized as unfair to foreseeable future plaintiffs. However, the document destruction at issue began more than 10 years before Willard was injured, and the evidence disclosed only one other accident involving on-track starting and none involving the wet clutch. In our opinion, such remote prelitigation document destruction would not be commonly understood by society as unfair or immoral. This factor too bodes against imposing liability.

Regarding Caterpillar's document alteration as late as 1989, Gehring testified she altered documents housed in the TIC that year, but the altered documents were retained. Thus, if an altered document was relevant to the issues of the case, it would have been produced in discovery. No altered documents from the TIC were produced, so apparently none were relevant to Willard's claims. Therefore, there was no evidence that Caterpillar's alteration of documents shortly before Willard's accident interfered with his ability to win his lawsuit.

(4) *Actor's motive*: The evidence viewed in the light most favorable to Willard disclosed that Caterpillar destroyed documents to make them unavailable to potential products liability plaintiffs and so they could not be used in future litigation against Caterpillar. Accordingly, this factor supports the imposition of liability.

Weighed together, however, the Restatement factors militate against extending tort liability for the spoliation of evidence in this case. When Caterpillar destroyed documents in 1978-1979, thousands of the 1955 model D7-C tractor had been in use for almost 25 years. That extensive period of actual use experience bears substantially on factors relevant to the question of whether the destruction was tortious. It provided Willard a potential fund of evidence invalidating Caterpillar's original risk/benefit analysis, so the design documents should not have been the only evidence on the risk/benefit issue or Caterpillar's knowledge of the risks inherent in the alleged design defects. The likelihood that the missing documents contained risk/benefit information helpful to Willard is diminished by the long experience of accident-free product use, so the inference that the destruction actually

caused any substantial harm to Willard is even more speculative than in other spoliation cases. Also, the facts that the evidence disclosed only one other accident involving a tractor with the alleged on-track starting design defect at the time Caterpillar destroyed the documents, and that Willard was not injured until many years after the destruction policy was initiated, soften any moral stigma attached to Caterpillar's conduct.[3]

We recognize there are competing public policy issues entangled in the question of how far the spoliation tort should extend. On one hand, destruction of evidence undermines two important goals of the legal system—truth and fairness. (Solum & Marzen, *Truth and Uncertainty: Legal Control of the Destruction of Evidence, supra*, 36 Emory L.J. at pp. 1138-1140.) Moreover, alternative sanctions and remedies may not provide sufficient deterrence. (Nesson, *Incentives to Spoliate Evidence in Civil Litigation: The Need for Vigorous Judicial Action* (1991) 13 Cardozo L.Rev. 793; Nolte, *The Spoliation Tort: An Approach To Underlying Principles, supra*, 26 St. Mary's L.J. at pp. 401-402; Hendricks & Moch, *Protective Orders: The Industry's Silencer on the Smoking Gun* (1994) 73 Mich. Bus. L.J. 424.) On the other hand, subjecting individuals and businesses to potential tort liability for destroying their own property or documents necessarily imposes burdens which result in both economic cost and some loss of freedom. Until the Legislature or the California Supreme Court defines the limits of this evolving tort, trial and appellate courts must balance the various policies and interests on a case-by-case basis. On the facts of this case we conclude that Willard's claim for intentional spoliation of evidence should not have been submitted to the jury.

In view of our conclusion, other related issues raised by Caterpillar and amici curiae are moot: (a) whether tort liability should be limited to those products liability cases where the product is destroyed, (b) whether tort liability should be limited to those cases where there is an agreement or special relationship imposing a duty to preserve evidence, and (c) whether the plaintiff should be precluded from pursuing a spoliation claim prior to the resolution of the underlying action.

---

[3]One of the questions left undecided by the Supreme Court in *Della Penna* v. *Toyota Motor Sales, U.S.A., Inc., supra*, 11 Cal.4th 376, was whether a " 'disinterested malevolence,' in Justice Holmes's words (*Amer. Bank & Trust Co.* v. *Federal Bank* (1921) 256 U.S. 350, 358 [65 L.Ed. 983, 990, 41 S.Ct. 499, 25 A.L.R. 971]) is an actionable interference in itself, . . ." (*Id.* at p. 393.) However that question may ultimately be answered would not affect our analysis. Here, as we have stated, Caterpillar did serve its own legitimate interest in discarding outdated design documents which were not relevant to any known pending claims or actions.

2.-4.*

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

## DISPOSITION

The judgment is reversed and the cause remanded for new trial in accordance with the views expressed herein. Costs to appellant Caterpillar, Inc.

Harris, J., and Buckley, J., concurred.

---

*See footnote, *ante*, page 892.