**MARIN TUG & BARGE, INC., as Owner of the Barge Marin Tenor, Plaintiff,**

**and**

**Jeffrey L. Mudgett; Susan Mudgett, Plaintiffs–Appellants,**

v.

**WESTPORT PETROLEUM, INC.; Shell Oil Products Company, Defendants–Appellees.**

No. 99–17154.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Sept. 13, 2000

Filed Nov. 14, 2001

Jeff Mudgett, Gig Harbor, Washington, for the real parties in interest and the plaintiffs-appellants.

Michael K. Johnson, Lewis, D'Amato, Brisbois & Bisgaard, San Francisco, California, for the defendants-appellees.

Before: GRABER, FISHER and BERZON, Circuit Judges.

BERZON, Circuit Judge:

Jeffrey and Susan Mudgett (the "Mudgetts") appeal the district court's grant of summary judgment against them in their action for intentional interference with prospective economic advantage. We affirm.

## I.

### Background

At the time the events underlying this case occurred, the Mudgetts were the owners and operators of Marin Tug and Barge, Inc., a small barge company that transports petroleum products in and around the San Francisco Bay. This litigation arises from Shell Oil's contamination of one of Marin Tug's barges, the Marin Tenor. The Tenor moved "bunker fuel," i.e., oil used in fueling ships' engines, to waiting ships. Because the diesel engines that power the receiving ships are highly sensitive to abrasives, bunker fuel must meet certain specifications regarding aluminum and silicon oxide content. (Aluminum and silicon oxide are used as catalysts in the refining process.)

Pursuant to a contract between Marin Tug and fuel broker Westport Petroleum, the Tenor was loaded with marine fuel oil at Shell's Martinez refinery. It turned out that there were large amounts of alumina and silica in Shell's delivery line. The oil loaded onto the Tenor was substandard, or "off-specification," because it contained an excess of harmful abrasives. Unaware of the contamination, the Tenor delivered the fuel as planned to the receiving ship, the OOCL Japan, and soon thereafter transported another load of fuel from a Chevron Oil refinery to the vessel Direct Eagle. A few days later, Marin Tug learned that the fuel delivered to the Direct Eagle was contaminated, and two days after that, believing the Tenor was the source of the contamination, took the barge out of service.

In a series of communications over the following weeks, Marin Tug notified West-

port that it (Marin Tug) considered Westport liable for contaminating the Tenor and thought it necessary to clean the Tenor fully. Westport indicated its preference that, instead of full cleaning, Marin Tug attempt a less costly "flushing" experiment.[1] Marin Tug agreed, and two flushing voyages were completed.

Westport then hired the firm of Matthews, Matson & Kelly to analyze for metal content samples of the fuel carried on the flushing voyages. The Matthews firm concluded that the contaminants remaining in the Tenor had been sufficiently diluted by flushing to permit the barge to return to service. A second survey company, however, using a different sampling method, showed higher levels of contaminants than those found by the Matthews firm.

After receiving these results, Marin Tug informed Westport that it planned to remove the Tenor's pumps and prepare for cleaning, a measure Marin Tug deemed necessary in the light of laboratory analyses showing deposits of alumina and silica still in the Tenor's bottoms. Westport objected, contending that the flushing had diluted the contamination enough to allow safe transportation of fuel. Westport therefore refused to bear the costs of Marin Tug's unilateral decision to clean the barge. Marin Tug's dock staff nonetheless undertook the cleaning process between August 1 and August 20, 1996; the barge did not operate during that period. Afterward, the Tenor was sold to a third party.

On November 27, 1996, Marin Tug filed an Admiralty Limitation of Liability or Exoneration complaint in federal district court.[2] On the same day, Marin Tug com-

---

1. "Flushing" involves repeated loading and unloading of fuel in order to stir up and remove contamination.

2. OOCL filed a claim and answer in the limitation proceeding, seeking more than $3 million in damages for harm to its vessel Japan resulting from the contaminated fuel. On January 9, 1998, Judge Wilken exonerated

menced a civil action against Shell Oil and Westport, raising various contract and tort claims.

After the civil action was filed, Shell refused to have further business dealings with Marin Tug and prohibited Marin Tug from loading fuel at Shell's Martinez refinery. The effect of Shell's refusal to deal was not only that Shell would no longer contract with Marin Tug but also that Marin Tug could no longer do business with third-party fuel brokers and consumers who otherwise would have hired it to transport Shell oil.

In response to Shell's refusal to deal, Marin Tug amended its complaint to allege intentional interference with prospective economic advantage,[3] claiming that "Shell's action is an attempt to force Marin Tug and Barge to dismiss this litigation."[4]

Shell thereupon moved for partial summary judgment, maintaining that the refusal to deal was for legitimate business reasons and therefore is not actionable under California law.

The evidence submitted in support of this contention included a letter dated two months after Marin Tug filed suit against Shell. In that letter, Daniel R. Trufino, Jr., wrote:

> Shell has no desire to "destroy" Marin Tug and Barge. However, we do not choose to expose Shell to the possibility of additional unfounded claims.
>
> We continued to accept Marin vessels at [our] Martinez [facility], both directly and as a carrier for third parties, until you chose to file and serve your suit against Shell. Since that time, we have advised anyone who attempted to send a Marin vessel to Martinez that we no longer accepted Marin Vessels. This is strictly a business decision and not at all based on the characteristics or suitability of the vessels.
>
> .... This was a decision made solely by Shell as a result of the unsatisfactory relationship that has developed between our two companies. Shell has made no effort to influence attitudes or actions of third parties in their potential dealings with Marin Tug so long as Shell Martinez is not involved.

In further explanation of its actions, Shell submitted a declaration from Trufino stating that Shell refused to deal with Marin Tug only after "Marin chose to pursue its claims in court without first attempting to reach a reasonable commercial resolution," leading Shell to choose "not to expose [itself] to the possibility of further unreasonable conduct. To do this it was necessary to refuse Marin vessels at the dock as well as not contract directly [with Marin Tug] for transportation." The Trufino declaration noted, as an example of Marin Tug's unreasonable behavior, that Marin Tug had presented a claim for nearly $680,000 at a settlement meeting "with a minimal explanation of some calculations, but ... no supporting documentation."

The Mudgetts countered with a declaration asserting that Shell had offered to end the boycott if Marin Tug dropped the lawsuit. Additionally, the Mudgetts noted (1) that the dispute over payment for the cleaning, including accusations that Marin Tug was being unreasonable, long predated the instigation of the lawsuit, yet the boycott started only after the lawsuit was

---

Marin Tug and forever discharged it from all liability arising from the contamination.

**3.** The amended complaint also alleged intentional interference with contractual relations, a claim not at issue in this appeal.

**4.** In May of 1997, when Marin Tug and Barge was sold to a new owner, the company assigned its pending claims to Jeffrey and Susan Mudgett.

filed; and (2) the $680,000 settlement offer—which the Mudgetts maintain was adequately explained—was made after Shell announced that it would not permit Marin Tug to carry its oil, and so could not have been a basis for that decision. Additionally, the Mudgetts noted that oil sold or purchased by Shell Oil can be moved on barges hired by either the buyer or seller; by refusing to allow Marin Tug to carry its oil, consequently, Shell was not simply refusing to contract with Marin Tug but was preventing others from doing so where transportation of Shell oil was involved. From these facts, the Mudgetts maintained, a trier of fact could infer that Shell's motive was to wield its economic power in the local oil transportation market so as to induce Marin Tug to dismiss the action or, failing that, to punish the barge company for undertaking the litigation.

The district court granted partial summary judgment in favor of defendants with regard to the Mudgetts' claims of intentional interference.[5] Although it recognized that it was the filing of the lawsuit that triggered Shell's refusal to ship on Marin Tug's barges, the district court held that the boycott was not retaliatory, because "each of the reasons Shell proffered as to why it boycotted Marin Tug is consistent with its purported desire to limit its liability and its belief that Marin Tug was being commercially unreasonable." The court went on to hold that even if Shell did act in retaliation for the lawsuit, the refusal to deal would not establish wrongfulness, a necessary element of the tort of intentional interference with prospective economic advantage in California. *See Della Penna v. Toyota Motor Sales, U.S.A., Inc.,* 11 Cal.4th 376, 45 Cal.Rptr.2d 436, 902 P.2d 740 (1995).[6]

The Mudgetts appealed the district court's order, arguing that the "wrongfulness" element of the tort had indeed been satisfied. Because the decisions of the Supreme Court of California provide no controlling precedent on this issue, we certified to that court the following question:

Is it "wrongful" for purposes of the tort of intentional interference with prospective economic advantage for a defendant in a civil lawsuit to refuse to deal with the plaintiff in that suit when the following circumstances exist: (1) the refusal to deal precludes not only business between the plaintiff and the defendant but also a substantial amount of business between the plaintiff and third parties who do business with the defendant; (2) the refusal to deal is intended to coerce the plaintiff to abandon or settle the lawsuit; and (3) the defendant has sufficient economic power that the refusal to deal could indeed have that effect?

*Marin Tug & Barge, Inc. v. Westport Petroleum, Inc.,* 238 F.3d 1159, 1160 (9th Cir.2001).

■ The state supreme court declined our request for certification. Accordingly,

---

5. The contract and tort claims not resolved by the partial grant of summary judgment were the subject of a bench trial, after which the district court awarded the Mudgetts $38,612.62 in actual damages, holding Westport and Shell jointly and severally liable for breach of contract and negligent trespass, respectively. The Mudgetts appealed that judgment, arguing that the district court erroneously rejected certain theories of liability and that the court's calculation of the Mudgetts'

damages was incorrect. By unpublished memorandum disposition, we affirmed in part, reversed in part, and remanded for the district court to consider whether the Mudgetts were entitled to additional damages.

6. Throughout this case, both parties have treated California law as applicable to the intentional interference issue.

we must "predict as best we can what the California Supreme Court would do in these circumstances." *Pacheco v. United States,* 220 F.3d 1126, 1131 (9th Cir.2000).

## II.

### Analysis

#### 1. *Shell's Motive*

■ Because the district court resolved the matter on summary judgment, we draw all reasonable inferences in favor of the Mudgetts. *Block v. City of Los Angeles,* 253 F.3d 410, 421 (9th Cir.2001). After doing so, we conclude that a trier of fact could reasonably infer that Shell's motive in refusing to load its oil on Marin Tug barges was retaliatory. (We use the word "retaliatory" here and elsewhere in this opinion in the sense that the parties in this case and the district court have used it, that is, to mean actions intended either to induce Marin Tug to drop its lawsuit or to punish the company for having brought it.)

There was some evidence that Shell offered to resume shipping in Marin Tug's barges if Marin dropped the lawsuit. There was also evidence—including the fact that the boycott began right after the lawsuit began and long after the dispute arose, as well as Shell's out-of-sequence reliance on post-boycott proposals as an explanation for the refusal to deal—from which one could find that Shell's explanation of its motives was pretextual and that the real motive was to retaliate for the filing of the lawsuit against it. We therefore do not subscribe to the district court's assessment that there were no material facts in dispute, and that the Mudgetts therefore failed to meet their burden on summary judgment with regard to whether Shell's motive was retaliatory. We conclude instead that, resolving all factual disputes and drawing all inferences against Shell (the moving party), one could infer that Shell's refusal to deal was carried out either in order to induce Marin Tug (and later the Mudgetts) to abandon this lawsuit or to impose punishment for bringing it. So we must decide whether Shell committed the tort of intentional interference of prospective economic advantage by doing a perfectly lawful thing—refusing unilaterally either to contract with Marin Tug or to allow its oil to be carried on Marin Tug barges—because it did so with the purpose of interfering with Marin Tug's resort to the courts to settle a dispute.

#### 2. *Intentional Interference with Prospective Economic Advantage*

To answer that question, we begin by surveying the relevant principles of California law, indistinct as they are (as we shall soon see).

■ In *Della Penna,* the California Supreme Court ("the Court") recounted the complicated history of the tort of intentional interference with prospective economic advantage. 45 Cal.Rptr.2d 436, 902 P.2d at 743–51.[7] The Court noted that nearly a majority of state supreme courts, following the lead of the Oregon Supreme Court in *Top Service Body Shop, Inc. v. Allstate Insurance Co.,* 283 Or. 201, 582 P.2d 1365 (Or.1978), had in recent years abandoned the prima facie tort approach to the intentional interference tort—under which the defendant had to prove a privilege or justification for interfering with the prospective business dealings of third parties—in favor of an approach placing the burden on the plaintiff to prove wrongful or improper behavior. *Della Penna,* 45 Cal.Rptr.2d 436, 902 P.2d at 746–47. Recognizing that "the law usually takes care to draw lines of legal liability in a way

---

7. Other state court opinions have covered much the same ground. *See, e.g., Top Serv. Body Shop Inc. v. Allstate Ins. Co.,* 283 Or. 201, 582 P.2d 1365 (1978); *Kutcher v. Zimmerman,* 87 Hawai'i 394, 957 P.2d 1076 (1998).

that maximizes areas of competition free of legal penalties," the California Court decided to embrace a general approach similar to that pioneered by the Oregon Supreme Court in *Della Penna*, 45 Cal. Rptr.2d 436, 902 P.2d at 750–51. Henceforth, the Court announced, · a plaintiff "must plead and prove as part of its case-in-chief that the defendant not only knowingly interfered with the plaintiff's expectancy, but engaged in conduct that was *wrongful by some legal measure other than the fact of interference itself.*"[8] *Id.* at 751 (emphasis added).

The Court's majority did not go beyond that very general conclusion, despite a lengthy, careful, and thoughtful concurrence by Justice Mosk arguing for more precision.[9] Expressly declining to define the contours of the "wrongful" element, the Court stated that

> the case, if any, to be made for adopting refinements to that element of the tort-requiring the plaintiff to prove, for example, that the defendant's conduct amounted to an independently tortious act, or was a species of anticompetitive behavior proscribed by positive law, or was motivated by unalloyed malice-can be considered on another day, and in another case.

*Id.* at 741.

Subsequent decisions from the California Courts of Appeal have set forth interpretations of the "wrongful" standard that appear to be in conflict. *Compare PMC,*

*Inc. v. Saban Entm't, Inc.,* 45 Cal.App.4th 579, 52 Cal.Rptr.2d 877, 891 (1996) (" 'Defendant's liability may arise from improper motives or from the use of improper means.' ") (quoting *Top Serv. Body Shop,* 582 P.2d at 1371), *with Arntz Contr. Co. v. St. Paul Fire & Marine Ins. Co.,* 47 Cal. App.4th 464, 54 Cal.Rptr.2d 888, 895 (1996) ("[O]ur focus for determining the *wrongfulness* of . . . intentional acts should be on the defendant's objective conduct, and evidence of motive or other subjective states of mind is relevant only to illuminating the nature of that conduct."); *see also Korea Supply Co. v. Lockheed Martin Corp.,* 90 Cal.App.4th 902, 109 Cal.Rptr.2d 417, 427 (2001) (endorsing Justice Mosk's position in concurrence in *Della Penna* that motive is irrelevant). One other reported California appellate case expressly refused to take sides in this dispute, instead considering the facts before it under all possible standards and concluding that the tort was not made out under any of them. *See LiMandri v. Judkins,* 52 Cal.App.4th 326, 60 Cal.Rptr.2d 539, 546–47 (Ct.App.1997). As these diverse decisions indicate, the precise type of wrongfulness necessary to trigger liability for intentional interference with prospective economic advantage remains very much an unresolved question in California.

### 3. *The Principles Applicable Here*

■ It is therefore with some trepidation that we tread into this area of Califor-

---

8. The remaining elements of the tort, which are not at issue in this appeal, are: (1) an economic relationship between the plaintiff and another, containing a probable future economic benefit or advantage to plaintiff, (2) defendant's knowledge of the existence of the relationship, (3) defendant's intentional conduct designed to interfere with or disrupt the relationship, (4) actual disruption, and (5) damage to the plaintiff as a result of defendant's acts. *Della Penna,* 45 Cal.Rptr.2d 436, 902 P.2d at 743 n. 1.

9. Justice Mosk maintained, ·among other things, that the historical focus of the tort of interference with prospective economic advantage on the interfering party's motive was wrongheaded; instead, "motive is altogether immaterial," 45 Cal.Rptr.2d 436, 902 P.2d at 757 (Mosk, J., concurring), and "[o]ur focus should be on objective conduct and consequences . . . [and] with such conduct and consequences as are unlawful," *id.* at 760–761.

nia tort law. Looking at that law as a whole, however, including cases decided before *Della Penna;* concentrating on results as well as reasoning; and considering not only intentional interference with prospective economic advantage but also related areas such as the protection accorded employees for discharges against public policy, we conclude that the plaintiffs here cannot make out a case.

California law points toward three principles that, taken together, undergird that conclusion:

■ *First,* even before *Della Penna,* during the period when the California law of intentional interference with prospective economic advantage placed a less stringent burden on plaintiffs, it was clear with regard to refusals to deal in particular that,

"in the absence of prohibition by statute, illegitimate means, or some other *unlawful* element, a defendant seeking to increase his own business may ... refuse to deal with [the plaintiff] or threaten to discharge employees who do, or even refuse to deal with third parties unless they cease dealing with the plaintiff, all without incurring liability."

*A–Mark Coin Co. v. General Mills, Inc.,* 148 Cal.App.3d 312, 195 Cal.Rptr. 859, 867 (1983) (emphasis added) (quoting PROSSER, THE LAW OF TORTS § 130, at 954–55 (4th ed.1971)). *A–Mark Coin* does not speak directly to whether a defendant is insulated from liability when the refusal to deal is intended to coerce the plaintiff to

drop or settle a lawsuit. But it does establish, as a background principle, that the tort of interference with prospective economic advantage was not intended broadly to limit individuals or commercial entities in choosing their commercial relationships, whatever their motives in doing so might be—unless those motives are independently unlawful.[10]

■ *Second,* and closely connected to that background principle, California law has long recognized that the core of intentional interference business torts is interference with an economic relationship by a third-party *stranger* to that relationship, so that an entity with a direct interest or involvement in that relationship is not usually liable for harm caused by pursuit of its interests. *Della Penna,* 45 Cal.Rptr.2d 436, 902 P.2d at 750; *Hamro v. Shell Oil,* 674 F.2d 784, 790 (9th Cir.1982); *Exxon Corp. v. Superior Court,* 51 Cal.App.4th 1672, 60 Cal.Rptr.2d 195, 205 (1997).

*Third,* although *Della Penna* itself [11] and some California cases since then have not ruled out the possibility that a malicious motive or one otherwise against general public policy could be sufficient to establish the "wrongful" element of the tort, *see LiMandri,* 60 Cal.Rptr.2d at 546 (citing *Willard v. Caterpillar, Inc.,* 40 Cal.App.4th 892, 48 Cal.Rptr.2d 607 (1995)); *PMC, Inc.,* 52 Cal.Rptr.2d at 891, there are no post-*Della Penna* cases that actually found liability on the basis that the defendant merely had a wrongful motive. By contrast, in the two cases in which reliance on

---

**10.** Although, as far as we are aware, no California court has addressed this precise question, the lawfulness of a refusal to deal in retaliation for bringing suit was long ago tested in another jurisdiction, with results favorable to Shell. In *House of Materials, Inc. v. Simplicity Pattern Co.,* 298 F.2d 867 (2d Cir. 1962), the United States Court of Appeals for the Second Circuit rejected plaintiff's argument that such refusal amounted to a prima facie tort (under the old mode of applying this

tort), remarking that "a company is free to select its business relations in its own interest." *Id.* at 872 (internal citation and quotation marks omitted).

**11.** *Della Penna* left open the possibility that an act "motivated by unalloyed malice" could satisfy the "wrongful" element. *Della Penna,* 45 Cal.Rptr.2d 436, 902 P.2d·at 741.

a wrongful motive might have made a difference, the California appellate courts adopted Justice Mosk's view in his *Della Penna* concurrence that motive, standing alone, is entirely irrelevant. *Arntz Contracting Co.*, 54 Cal.Rptr.2d at 895 (holding that "bad thoughts are no tort" and that "our focus for determining the *wrongfulness* of those intentional acts should be on the defendant's objective conduct," (citing *Boyson v. Thorn*, 98 Cal. 578, 33 P. 492 (1893), and Justice Mosk's concurrence in *Della Penna); Korea Supply Co.*, 109 Cal. Rptr.2d at 427).

The reasoning and results of those post-*Della Penna* California appellate cases that have actually had to confront the question of the pertinence of bad motive appear to us to be a significant indicator of how the California Supreme Court will ultimately rule if and when it confronts the issue. Further, strong policy considerations counsel that conclusion. Unless the wrongfulness inquiry is limited to those motives or species of malice already proscribed by established legal principles—racial discrimination, for example—parties would be without clear guidelines as to whether any particular manifestation of ill-will would suffice. The result would be uncertainty as to how to tailor conduct in order to avoid liability.[12]

Modern jurisprudence does in many instances, it is true, turn liability on motive.[13] Justice Mosk's concurring opinion in *Della Penna*, which exhibits a general suspicion

of judicial assessments of motivation (*see id.* at 759–760), is in that respect out of keeping with a wide body of contemporary law, and may well overstate the dangers and difficulties of relying on motive as the basis for finding conduct unlawful. In the many instances where unlawful motive is the basis for sanctioning behavior, however, the forbidden motive is generally a specific one, proscribed by a particular statute, regulation, or constitutional provision, not one derived from general judicial perceptions of public policy. The citizenry thereby has notice of which motives are unlawful and can accordingly govern its behavior.

Developments in the California law of tortious wrongful discharge demonstrate the force of this distinction between generalized proscription of bad motives or motives inconsistent with public policy on one hand and specifically proscribed motives on the other. *Gantt v. Sentry Ins.*, 1 Cal.4th 1083, 4 Cal.Rptr.2d 874, 824 P.2d 680 (1992), held that "an employee who was terminated in retaliation for supporting a coworker's claim of sexual harassment may state a cause of action for tortious discharge against public policy...." *Id.* at 1085, 4 Cal.Rptr.2d 874, 824 P.2d 680. In so holding, *Gantt* did not rely on judicially defined notions of public policy as the basis for discovering forbidden motives for discharges, for it recognized that a generalized notion of public policy "is

---

12. *Arntz Contracting Co.* and *Korea Supply Co.* both can be read as proscribing *any* reliance on motive as independently meeting the "wrongful" element of the tort, but neither involved a situation in which there was a motive specifically proscribed by positive law.

13. *See, e.g.*, Unruh Civil Rights Act, California Civil Code § 51, and cases under it, including *Jackson v. Superior Court*, 30 Cal.App.4th 936, 36 Cal.Rptr.2d 207 (1994) (holding that a business owner stated a cause of action under

the Unruh Act by alleging that, when he sought to accompany clients to transact their business inside a bank, he was denied admittance to the bank because of his race); Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. (barring otherwise legal employer actions, such as discharge, when made on the basis of race or sex); *Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976) (requiring proof of discriminatory intent in equal protection cases).

notoriously resistent to precise definition." *Id.* at 1094, 4 Cal.Rptr.2d 874, 824 P.2d 680. Instead, *Gantt* found that retaliation for refusal to testify untruthfully or to withhold testimony regarding employment discrimination is a misdemeanor under a specific California statute and held the discharge tortious for that reason. Although the California Supreme Court later broadly expanded the sources of positive law that can inform the wrongful discharge against public policy tort to include, for example, regulations grounded in legislative enactments, *see Green v. Ralee Engineering Co.*, 19 Cal.4th 66, 78 Cal.Rptr.2d 16, 960 P.2d 1046 (1998), the Court continued to express concern with delimiting the scope of the anti-public policy motives that can support the wrongful termination tort, "'lest [courts] mistake their own predilections for public policy which deserves recognition at law.'" *Green* at 1049, *citing Hentzel v. Singer Co.*, 138 Cal.App.3d 290, 188 Cal.Rptr. 159 (1982).

We conclude that if faced with the issue, the California Supreme Court would either eliminate motive, standing alone, as a basis for the wrongfulness element of the tort of intentional interference with prospective economic advantage or, more likely, import into the tort a limitation on motive-based causes of action similar to the one used under *Gantt* and its progeny.

### 4. *Application to This Case*

Shell's refusal to deal was wrongful, say the Mudgetts, because it interfered with the Mudgetts' constitutionally protected right to petition government for redress of grievances and was contrary to California's public policy favoring judicial resolution of disputes over self-help remedies.[14] Applying the standards derived above to the facts at hand, we conclude the Mudgetts cannot on these grounds make out the requisite showing of wrongfulness.

Shell's actions were, at bottom, simply a refusal to deal with Marin Tug, and therefore presumptively valid, under *A–Mark*, absent some *unlawful* element. We are not dissuaded from this conclusion by the fact that in some instances the actual contracts were between Marin Tug and the buyer, not with Shell. Such contracts, no less than those in which Marin Tug contracted directly with Shell, required direct, active involvement by Shell—the loading of Shell oil onto Marin Tug's barges. Because the economic relationship between Marin Tug and the buyer of any Shell oil shipped on Marin Tug's barges depends on Shell's cooperation, Shell is not easily characterized as a stranger to that relationship. Further, as the underlying dispute that gave rise to this lawsuit demonstrates, Shell and Marin Tug had a mutual economic interest in delivering the oil safely and cleanly, and were dependent upon each other to do so. In this situation, there is nothing wrongful under California law about the *means* Shell chose to advance its interests, a simple refusal to deal with Marin Tug or to load its oil on Marin Tug's barges.

The Mudgetts' intentional interference claim depends entirely, then, upon a showing that Shell acted with a wrongful

---

**14.** Appellants do not adequately put forward any other basis for finding wrongfulness. The Mudgetts vaguely suggest for the first time in their supplemental brief that Shell's actions may constitute "independent tort grounds" that meet the wrongfulness requirement. This contention, however, comes too late, *see Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 919 (9th Cir.2001), and, in any event, is entirely too indistinct for us to entertain: All we are told is that Shell's actions "contain elements of deceit, misrepresentation, defamation, intimidation, obstruction, coercion and fraud." Some of the terms listed describe common law torts, some do not, and "contain[ing] elements of" a tort does not make a course of conduct tortious.

motive. Our inquiry into California law predicted, however, that the California Supreme Court may accept the position advocated in Justice Mosk's concurrence in *Della Penna* (and by two post-*Della Penna* court of appeal opinions) that motive is entirely irrelevant to the tort. If so, the Mudgetts' cause of action would necessarily fail.

The Mudgetts' cause of action would also fail if California law instead adopted the alternative approach discussed above, limiting "wrongful" motives to those proscribed by some constitutional, statutory, regulatory or other determinable legal standard.[15] The Mudgetts correctly point out that unimpeded access to the courts is a value constitutionally protected from governmental impairment, often protected by law from private impairment (as illustrated by *Gantt*), and favored by public policy. The Mudgetts fail, however, to demonstrate that the refusal by Shell—a private party—to deal with Marin Tug in order to influence or punish Marin Tug's lawsuit against it is proscribed by any statute, constitutional provision, or other independent source of legal principles.

## CONCLUSION

We conclude that the district court properly granted summary judgment to Shell on its alternative ground that even if retaliatory, Shell's refusal to deal with Marin Tug was not "wrongful" in the sense required to make out the California tort of intentional interference with prospective economic advantage.

**AFFIRMED.**

---

**15.** We need not determine precisely which sources of law California would recognize as proper bases for finding a wrongful motive, as the Mudgetts point to *no* established legal rule generally forbidding a private party to act with the motive of retaliating for the filing of a lawsuit.